Noelle E. Dwarzski OSB 131866
noelled@bcmjlaw.com
Barlow Coughran Morales & Josephson, P.S.
1325 Fourth Avenue, Suite 910
Seattle, WA 98101
Tel. (206) 224-9900
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AT PORTLAND

| | |
|---|---|
| BOARDS OF TRUSTEES OF THE UFCW LOCAL 555-EMPLOYERS HEALTH TRUST and OREGON RETAIL EMPLOYEES PENSION TRUST,<br><br>                    Plaintiffs,<br>      v.<br><br>FARR'S HARDWARE, INC.,<br><br>                    Defendant. | Case No.<br><br>COMPLAINT TO ENFORCE TERMS OF TRUST AGREEMENTS – DEMAND FOR AUDIT OF PAYROLL RECORDS AND FOR DELINQUENT FRINGE BENEFIT CONTRIBUTIONS (ERISA) |

For its complaint, Plaintiff alleges as follows:

## I.    PARTIES AND JURISDICTION

1.1    Plaintiff Board of Trustees is the Plan Sponsor, as defined by ERISA of the UFCW Local 555-Employers Health Trust (the "Health Trust") - a Taft-Hartley trust fund created for the purpose of providing covered participants, dependents, and beneficiaries with medical, dental, prescription, disability and related benefits.  It maintains its principal and administrative offices in Tualatin, Washington County, Oregon.

COMPLAINT – 1

1.2     Plaintiff Boards of Trustees is the Plan Sponsor, as defined by ERISA, of the Oregon Retail Employees Pension Trust (the "Pension Trust") a Taft-Hartley trust fund created for the purpose of providing retirement benefits to participants and their beneficiaries.  It maintains its principal and administrative offices in Tualatin, Washington County, Oregon.

1.3     Numerous employers pay fringe benefit contributions to the Health Trust and Pension Trust and the Trusts are "multiemployer plans" as that term is defined in 29 U.S.C. § 1002(37)(A) of ERISA.

1.4     The Boards of Trustees of the Health Trust and Pension Trust (collectively "Trust Funds") have discretionary authority and control over the management of the Trust Funds and are the Plan Sponsors and "fiduciaries" as that term is defined in 29 U.S.C. § 1002(21)(A) of ERISA.

1.5     The Trust Funds are administered by a third-party administrator, Zenith American Solutions ("Zenith").  Zenith maintains records on behalf of the Trust Funds, which include, but are not limited to, the trust agreements and any amendments thereto, employer signature pages, labor agreements and amendments thereto, employer remittance reports, employer payroll audits, records maintaining employee eligibility, and participant and beneficiary eligibility, etc.

1.6     An employer's obligation to contribute to ERISA trust funds arises out of a written agreement, which is generally a collective bargaining agreement or other labor agreement.  Employers bound to a collective bargaining agreement ("CBA") are often referred to as "signatory employer(s)."

1.7     Signatory employers are required to report to the Trust Funds their employees performing covered work, hours worked, contributions owed and other specific information as specified in their CBA or required by the Trust Fund(s).

COMPLAINT – 2

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

1.8     An employer's failure to complete and submit its remittance reports timely, along with its contributions, is a violation of its obligations to the Trust Funds pursuant to Sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1145.

1.9     Defendant Farr's Hardware, Inc. ("Farr's") is an Oregon domestic company engaged in business in the State of Oregon with its business location listed as 880 South First Street, Coos Bay, Oregon 97420.

1.10     Defendant Farr's is engaged in business within the jurisdiction of this court, and such business affects commerce within the meaning of Section 301(a) of the Act.

1.11     Jurisdiction is conferred on this court by Section 301 of the LMRA, 29 U.S.C. § 186, and Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132and 1145.

1.12     Venue lies in the United States District Court for the District of Oregon under ERISA § 502, 29 U.S.C. §1132, and pursuant to the terms of the Trust Agreement.

## II.     FACTS

2.1     On May 23, 2019, Jay Farr, identifying himself as "Owner", executed a *Collective Bargaining Agreement* ("CBA") with the *United Food & Commercial Workers Union Local 555*. A true and correct copy is attached as Exhibit A.

2.2     By signing the CBA, Farr's agreed to make fringe benefit contributions to the Trust Funds on behalf of employees defined in Schedule A of the CBA.

2.3     Article 15 of the CBA provides:

> The Employer and the Union accept and agree to be bound by the terms of the existing Pension and Health and Welfare Trust Agreements established under the terms of this Agreement. . . . Employer agrees to and shall become a party to each of said Trusts with the same force and effect as though the Employer had executed the original declarations. . . . Any amendments that from time to time may be made to the aforesaid Trusts shall be binding upon the Employer . . .

COMPLAINT – 3

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

5600 137 hh19jc01vq

2.4    By executing the CBA and contributing to the Health Trust's benefit plan(s) and the Pension Trust's retirement plan(s), Farr's became bound by the written terms of the Trust Agreements for the Health Trust and Pension Trust.

2.5    Farr's obligations to the Health Trust are set forth in the Trust Agreement Governing the UFCW Local 555-Employers Health Trust.  Pursuant to the terms of the Health Trust's Trust Agreement, Farr's agreed to, among other things:

- Submit its contributions no later than the fifteenth (15th) of the month following the month in which reportable hours are worked or compensated;

- Submit to an audit of the company's payroll books and records as necessary for the administration of the Healthcare Trust;

- Payment of liquidated damages of ten percent (10%) on all delinquent contributions or fifty dollars ($50.00), whichever is greater, and accrued interest on delinquent contributions at twelve percent (12%) per annum; and

- Payment of the Healthcare Trust's attorney fees (with a minimum of $100.00) and costs of collection.

2.6    Farr's obligations to the Pension Trust are set forth in the Trust Agreement governing the Oregon Retail Employees Pension Trust.  Pursuant to the terms of the Pension Trust's Trust Agreement, Farr's agreed to, among other things:

- Submit its contributions by the date specified in the underlying collective bargaining agreement or as set by the trustees;

- Submit to an audit of the company's payroll books and records as necessary for the administration of the Pension Fund;

- Payment of liquidated damages of ten percent (10%) on all delinquent contributions or fifty dollars ($50.00), whichever is greater, and accrued interest on delinquent contributions at twelve percent (12%) per annum; and

- Payment of the Pension Fund's attorney fees (with a minimum of $100.00) and costs of collection.

COMPLAINT – 4

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

5600 137 hh19jc01vq

2.7    The Trust Agreements include clauses that require Farr's to submit to an audit by the Trust Funds of the company's payroll and related business records.

2.8    Pursuant to the terms of the Trust Agreements, the Trust Funds requested payroll records from Farr's to conduct a payroll audit covering January 2020 through current.

2.9    As the date of this complaint, Farr's has not terminated its CBA binding itself to the collective bargaining agreement and Trust Agreements.

### III.    CAUSES OF ACTION

First Cause of Action
(Breach of Labor Agreement/Trust Agreement)

3.1    The Trust Funds reallege each and every allegation contained in ¶¶1.1 – 2.9 above.

3.2    Farrs' failure to provide its payroll records so that the Trust Funds may perform an audit constitute a breach of the terms the CBA and Trust Agreements described above.

3.3    Farrs' failure to report and pay fringe benefit contributions also constitutes breaches of the CBA and Trust Agreements, the terms of which Farr's agreed to when it executed the CBA and became bound to the Trust Agreements.

3.4    As a result of Farrs' breaches, the Trust Funds have been damaged in an amount to be proven at trial.

Second Cause of Action
(Violation of ERISA)

3.5    The Trust Funds realleges each and every allegation contained in ¶¶1.1 – 3.4 above.

3.6    Farrs' failure to report and pay fringe benefit contributions constitutes a violation of §503(a)(3), §515 ERISA, codified at 29 U.S.C. §1132(a)(3), §1145.

COMPLAINT – 5

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

3.7     As a result of Farrs' violation, the Trust Funds have been damaged in an amount to be proven on motions or at trial.

3.8     The Trust Funds are also owed additional amounts for attorney fees, and costs of collection in an amount to be proven on motions or at trial.

### Third Cause of Action
### (Compel Production of Records for Payroll Audit)

3.9     The Trust Funds reallege each and every allegation contained in ¶¶1.1 – 3.8, above.

3.10    The Trust Agreements authorize the Trust Funds to audit contributing employer's books and records.

3.11    The Trust Funds have requested documents and payroll records necessary to complete an audit of Farrs' records for the period of January 2020 through current.

3.12    As of the date of this Complaint, Farr's has refused to provide the documents and payroll records necessary to complete an audit of its records for the period of January 2020 through current.

3.13    ERISA permits a fiduciary to bring suit to bring redress violations of the Trust Agreement or enforce provisions of the Trust Agreement.  29 U.S.C. § 1132(a)(3).

3.14    Pursuant to ERISA and the Trust Agreements, the Trust Funds are entitled to an award from this court ordering Farr's to turn over the documents and records necessary to complete an audit of its books and records and otherwise comply with the payroll audit provision of the Trust Agreements.

COMPLAINT – 6

5600 137 hh19jc01vq

## IV.    REQUESTED RELIEF

Plaintiff Trust Funds respectfully requests the Court grant the following relief:

A.    Judgment in favor of the Trust Funds against Farr's Hardware, Inc., for any and all amounts determined to be owing for January 2020 through the date of judgment pursuant to the terms of the labor and trust agreements governing the Trust Funds;

B.    An Order from the Court requiring Farr's Hardware, Inc. to produce the documents and records needed to allow the Trust Funds to complete an audit of its payroll records for the period of January 2020 through current;

C.    An award of attorney fees of not less than $5,000.00, plus costs of collection, as authorized by the labor and trust agreements;

D.    An award of post-judgment interest as authorized under ERISA and the applicable Trust Agreement; and

E.    Any other such relief under federal law or as is just and equitable.


DATED this 27th day of August, 2024

*s/ Noelle E. Dwarzski*

Noelle E. Dwarzski, OSB 131866
BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 Fourth Avenue, Suite 910
Seattle, WA 98101
Tel. (206) 224-9900
noelled@bcmjlaw.com
Attorneys for Plaintiff Trust Funds


COMPLAINT – 7

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

5600 137 hh19jc01vq





**EXHIBIT A**

**COLLECTIVE BARGAINING AGREEMENT BETWEEN**

**UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 555**

**AND**

**FARR'S HARDWARE**
**COOS BAY & COQUILLE, OREGON**

**May 1, 2019 — April 30, 2024**

1

# TABLE OF CONTENTS

TERM OF AGREEMENT ................................................................................3

PREAMBLE ................................................................................................3

ARTICLE 1 - RECOGNITION AND BARGAINING UNIT ...........................................3

ARTICLE 2 - UNION SECURITY ......................................................................3

ARTICLE 3 - MANAGEMENT RIGHTS ..............................................................4

ARTICLE 4 - DISCIPLINE AND DISCHARGE.......................................................5

ARTICLE 5 - DRUG AND ALCOHOL TESTING....................................................6

ARTICLE 6 - PROBATIONARY PERIOD .............................................................8

ARTICLE 7 - HOURS OF WORK.......................................................................8

ARTICLE 8 - SENIORITY - TRANSFER.............................................................10

ARTICLE 9 - WAGES ..................................................................................11

ARTICLE 10 - PAID TIME OFF........................................................................11

ARTICLE 11 - GENERAL CONDITIONS ...........................................................13

ARTICLE 12 - JURY DUTY ...........................................................................14

ARTICLE 13 - HEALTH & WELFARE................................................................14

ARTICLE 14 - PENSION ...............................................................................16

ARTICLE 15 - ACCEPTANCE OF TRUSTS........................................................17

ARTICLE 16 - NON-DISCRIMINATION..............................................................18

ARTICLE 17 - GRIEVANCE PROCEDURE.........................................................18

ARTICLE 18 - SEPARABILITY .......................................................................20

ARTICLE 19 - NO STRIKE CLAUSE................................................................21

ARTICLE 20 - SUBPOENAS .........................................................................21

ARTICLE 21 - WORK RULES.........................................................................21

ARTICLE 22 - PAST CUSTOM OR PRACTICE ...................................................21

ARTICLE 23 - PERFORMANCE OF UNIT WORK ................................................22

ARTICLE 24 - EXPIRATION AND RENEWAL......................................................22

SCHEDULE "A" .........................................................................................23

LETTER OF UNDERSTANDING .....................................................................25

LETTER OF UNDERSTANDING .....................................................................26

LETTER OF UNDERSTANDING .....................................................................27

LETTER OF UNDERSTANDING...............................................**Error! Bookmark not defined.**

Contract Ratified April 9, 2019

## COLLECTIVE BARGAINING AGREEMENT BETWEEN

## UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 555
## AND
## FARR'S HARDWARE
## COOS BAY & COQUILLE, OREGON

### May 1, 2019 — April 30, 2024

## TERM OF AGREEMENT

Effective 12:01 a.m., May 1, 2019 (Wednesday) through midnight April 30, 2024 (Tuesday).

## PREAMBLE

THE AGREEMENT, entered into this 1st day of May 2019, by and between Farr's Hardware, hereafter referred to as the "Employer" or "Company," and United Food and Commercial Workers Union, Local 555 (UFCW Local 555), chartered by the United Food & Commercial Workers International Union, referred to hereafter as the "Union."

## ARTICLE 1 - RECOGNITION AND BARGAINING UNIT

1.1    The Employer recognizes the Union as the sole collective bargaining agency for all of its employees working in the wage classifications referenced in Schedule "A," at its Coos Bay store located at 880 S. 1st Street, and its Coquille store located at 220 N. Central Street, excluding all other employees including store managers, office employees, assistant managers, guards and supervisors as defined in the Labor Management Relations Act of 1947 as amended, and other employees mutually agreed to by name or classification.

## ARTICLE 2 - UNION SECURITY

2.1    It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain members in good standing, and those who are not members in good standing on the effective date of this Agreement shall, on the thirtieth (30th) day following the effective date of this Agreement, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, on the thirtieth (30th) day following the beginning of such employment, become and remain members in good standing in the Union, by the payment of required initiation fees and periodic dues.

For the purpose of this Section, the execution date of this Agreement shall be considered as its effective date.

2.2    Upon the employment of any newly hired, transferred, or rehired employee, the Employer agrees to provide the newly hired employee with a Union application form and further agrees to forward such form to the Union's designated address within seven (7) calendar days: Upon request by the Employer to do so, the Union agrees to provide the Employer with suitable forms for this purpose.

2.3    Upon the failure of any employee to comply with any provision of Article 2, Section 2.1 of this Agreement, the Union may notify the Employer in writing of such failure, and thereupon the employee shall neither be continued in employment thereafter, nor rehired, unless the Employer is notified by the Union that such employee has made application to become a member in good standing in the Union.

2.4    (a)    Dues Check-Off. The Employer agrees to deduct Union dues from the wages of the employees in the bargaining unit who provide the Employer with a voluntary written authorization for such deduction. The deduction of the Union dues shall be made on a monthly basis and shall be forwarded to the Union within ten (10) calendar days of the beginning of the following month. In the event no wages are due the employee, or are insufficient to cover the required deduction, the deduction for such month shall be made in the succeeding month and forwarded to the Union. The Union agrees to provide the Employer with thirty (30) calendar days' notice of a change in any employee's monthly dues amount. The Union shall indemnify and hold the Employer harmless against any and all claims, demands, suits or other forms of liability, including but not limited to the Employer's attorneys' fees, that may arise out of or by reason of action taken or not taken by the Employer in reliance upon signed authorization cards furnished to the Employer by the Union for the purpose of complying with any of the provisions of this Article.

(b)    Employee and Employer obligations described in Section 2.4(a) above may be terminated by the Employer upon no less than thirty (30) calendar days' written notice to the employee and Union. Such written notice may not be delivered until on or after the expiration date of this Agreement. If terminated by the Employer, Section 2.4(a) may be incorporated by mutual agreement between the parties in any subsequent labor agreement.

2.5    Political Check-Off. For employees who voluntarily authorize a contribution to the UFCW Active Ballot club political action committee, the Employer agrees to deduct the authorized amount on a monthly basis and forward same to the Union within ten (10) calendar days of the beginning of the following month. Such political check-off form will remain in effect for no less than a one (1) year period during which time employees may not change the amount of the political deduction.

## ARTICLE 3 - MANAGEMENT RIGHTS

3.1    It is recognized that the Employer has and will continue to retain the exclusive

right and responsibility to operate and manage the Employer's business, facilities, properties and the work related activities of its employees. Rights of employees and the Union are limited to those rights set forth in the Contract and provided by the United States and Oregon Constitutions, and any applicable state or federal statutes and regulations.

3.2    Except as limited by the terms of this Contract, the Employer's managerial and operational authority includes, but is not limited to, the right to determine the location of facilities and work stations; the right to establish, relocate or close existing facilities; the right to subcontract; the right to maintain discipline and control; the determination of the size of the working force, the allocation and assignment of work; the creation, combination, modification or elimination of positions, and the determination of work schedules and hours of work. The Employer's right to subcontract shall not be used for the specific purpose of undermining or discriminating against the Union.

3.3    Except as specifically limited by this Agreement, the Employer shall control and supervise all operations and direct all working forces, including selection and hire, discipline or discharge for just cause, classify, reclassify, suspend, lay off, promote, demote or transfer employees, relieve them from duty, control and regulate the use of all equipment and other property of the Employer, and maintain discipline and efficiency among its employees, subject to this Agreement and the grievance procedure described herein.

3.4    The Employer retains all rights, powers and privileges not expressly specified in this Section and not specifically abridged by this Contract or statute.

3.5    The Employer has the right to install new monitoring equipment at its stores and in its company vehicles. Such monitoring equipment may include but may not be limited to cameras and GPS tracking systems. Any monitoring systems utilized by the Employer may provide information to the Employer that can subsequently be used for disciplinary purposes. If monitoring information acquired by the Employer is used for disciplinary purposes, the Employer will provide to the Union, and employee, upon written request, a copy of all such data used by the Employer as part of the disciplinary evaluation process. The Employer shall notify the Union and employees in the bargaining unit, in writing, prior to the utilization of any new monitoring equipment. Such notice shall identify the type of monitoring equipment to be used. If such written notice is not provided by the Employer to the Union and the employees in the bargaining unit, any evidence acquired through such new monitoring equipment cannot be used for disciplinary purposes.

## ARTICLE 4 - DISCIPLINE AND DISCHARGE

4.1    It is agreed that the Employer may select and employ without restrictions, and that it shall be the sole judge of the competency or fitness for any position of its employees. The Employer may discharge, discipline or suspend an employee for just cause, including but not limited to unsatisfactory work performance, violation of Employer rules, on or off the job criminal conduct, dishonesty, intoxication, insubordination, unbecoming conduct, failure to perform duties as required, failure to observe posted rules, regulations and safety rules, or any other conduct sufficiently serious in nature as to justify employee discipline regardless of whether the employee has been provided with a prior written warning concerning the conduct in question.

## ARTICLE 5 - DRUG AND ALCOHOL TESTING

5.1     The Employer and the Union recognize that the use and possession of alcohol and drugs is a serious and dangerous problem.  The Employer has "Zero Tolerance" against drugs or alcohol in the workplace.  To prevent problems from occurring at the workplace and to ensure the safety of all employees, the Employer will immediately discipline, and possibly terminate, any employee who violates this policy.

   a. Section 1 - Alcohol.  The possession, transfer, offering, consumption or being under the influence of any intoxicating liquor while on the Employer's property, or in other circumstances the Employer believes will adversely affect operations or safety, will generally result in immediate termination.  IMPORTANT: The conduct prohibited includes consumption of any intoxicating liquor prior to reporting to work or during breaks or lunch period.

   ALCOHOLIC beverages which are stored unopened in the employee's personal vehicle for future off-premise consumption shall not be included in the possession rule.

   b. Section 2 - Drugs.  The possession, transfer, sale, offering, consumption or being under the influence of any narcotic, hallucinogen, stimulant, sedative, legal or illegal drug (except as authorized and prescribed by a physician, and then only if reported to the supervisor prior to beginning work) while at work, or in other circumstances the Employer believes might adversely affect its operations or safety, will generally result in immediate termination.  IMPORTANT:  The conduct prohibited by this rule includes consumption of any such substance prior to reporting to work or during breaks or lunch period.  An employee who tests "positive" for any substance based on the results of urinalysis or breathalyzer testing, including an employee who tests positive as the result of an authorized prescribed substance that was not reported to the supervisor prior to beginning work, will be deemed "under the influence" for purposes of this article.  For purposes of this policy, a "positive" test means any detectable level of alcohol or drugs present in the individual's system (based on the results of urinalysis or breathalyzer testing).

   DRUGS are defined to include both illegally used "controlled substances" (illegal drugs or other controlled substances as defined under state or federal law, including narcotic and non-narcotic drugs and prescription drugs used abusively) and "non-controlled" (over the counter) substances if they can affect performance or safety.  Although the possession, distribution, use or sale of marijuana is legal in the State of Oregon, the Employer considers marijuana a drug subject to this policy.

   Prior to being tested, an employee who is using a prescription or over-the-counter drugs must report such use to the Employer.

   c. Section 3 - Right to Test and Search.  Employees may be subject to random drug and/or alcohol tests.

6

When reasonable grounds exist to believe an employee has consumed or is under the influence of alcohol or any substance in violation of this policy, or has otherwise violated this policy, the Employer may search the employee's possessions located on Employer's property, including clothes, locker, lunch box, car, etc., or any of his/her possessions. Failure to promptly permit such searches will be grounds for immediate unpaid suspension and discipline up to termination.

When reasonable grounds exist, the Employer may also require the employee to submit to appropriate tests for alcohol or prohibited drugs or substances in his/her system, including urinalysis and breathalyzer tests. Failure to submit to required drug and alcohol testing, failure to provide samples for testing, tampering or attempting to tamper with any test, subverting or attempting to subvert any test, or interfering with the accuracy of test results by delay, substitution, dilution, or adulteration, will be grounds for immediate unpaid suspension and termination.

Among the situations where the Employer may exercise its "reasonable grounds" right to test and search are the following:

1.  Unexplained significant changes in behavior (e.g., abusive behavior, repeated disregard of safety rules or procedures, insubordination etc.):
2.  Unexplained or suspicious absenteeism or tardiness;
3.  Credible reports of drug or alcohol use in violation of this policy;
4.  Credible reports of off-the-job illegal drug use or excessive alcohol use;
5.  Failure to complete or comply with a treatment program already started;
6.  Failure to sign a reentry or work performance contract after treatment has started;
7.  Employee admissions regarding drug or alcohol use;
8.  Covered workers' compensation injury;
9.  Unexplained absences from normal work areas where there is reason to suspect drug- or alcohol-related activity in violation of this Agreement;
10. Apparent physical symptoms of impairment or intoxication including but not limited to abnormal coordination, appearance, behavior, speech or odor; and
11. Other conduct indicating that he/she is not in a physical condition that would permit the employee to perform a job safely and efficiently.

Employees who feel that they have a legitimate grievance must still submit to the test, and then file a grievance.

All applicants for employment who have passed other pre-employment evaluations may be subject to drug and alcohol testing prior to beginning employment. Positive results of any degree will disqualify the applicant from employment, but the applicant may reapply after the expiration of 90 calendar days.

The Employer shall select reputable facilities for base testing and confirmatory testing at Employer's expense. The facility for confirmatory testing must meet all standards for laboratory performance, and they must employ certified Medical Technologists and Technicians.

The Union will be provided with the testing facilities' names, addresses, and credentials, if requested.

All samples which test positive will be confirmed using a superior or equally reliable test, if such confirming test is reasonably available.

The employee, at his/her expense, will have the opportunity to have a reputable testing facility test the same sample submitted to the original test facility. Accepted chain of custody procedures must be followed and the test facility must meet all standards set for laboratory performance using certified Medical Technologists and Technicians. An employee may request the independent test by notifying the Employer or designated Employer representative in writing within two (2) calendar days after the day the employee is informed of the test results. The test result will be kept confidential and will be available only to a designated Employer representative, a designated Union representative, or a designated legal representative.

Employees will be provided with transportation to the facility procuring the specific sample for testing. Transportation home will be offered to any employee believed to be under the influence of alcohol or drugs.

If an employee is suspended without pay by the Employer pending the results of a test, and this test proves to be negative, the employee will receive pay for scheduled time missed as a result of this suspension.

The Employer, at its sole discretion, may offer a second chance return to work agreement to an employee who violates this policy. An employee who returns to work after a suspension will be subject to monthly testing for a period of no less than thirty-six (36) months. If a positive test is returned, the employee will be terminated effective immediately. After this minimum thirty-six (36) month period, the employee will then participate in the pool for the monthly random testing with the rest of the employees, or if no pool exists, the employee will be subject to periodic testing without cause.

None of the testing procedures are intended to be in violation of the law, and if they are, they shall be eliminated without interfering with other parts of this Agreement.

## ARTICLE 6 - PROBATIONARY PERIOD

6.1    There shall be a probationary period of ninety (90) calendar days during which a new employee may be discharged by the Employer at its sole discretion with or without cause. This ninety (90) calendar day probationary period may be extended by another thirty (30) calendar days by the Employer upon written notice of such extension to the employee and the Union.

## ARTICLE 7 - HOURS OF WORK

7.1    The basic straight-time workweek shall consist of forty (40) hours, to be worked in five (5) eight (8) hour days within the calendar week.

7.2    The basic straight-time workday shall consist of eight (8) hours, to be worked within nine (9) consecutive hours, with one (1) uninterrupted hour off for a meal period at approximately the middle of the workday.

7.3    (a)    Overtime is defined as work in excess of forty (40) hours in the defined workweek. Overtime shall be paid for at one and one-half (1-1/2) times the employee's regular hourly rate of pay for any overtime work within the same workweek.

      (b)    The workweek shall be defined as starting Sunday at 12:01 a.m. and ending at midnight on Saturday.

7.4    Any employee who is scheduled to work, and reports to and remains available for work as scheduled by the Employer shall be paid for same, except in cases of emergency store closure. Provided however, that regular employees shall be guaranteed a minimum of four (4) hours' work, or pay in lieu thereof provided they are available for four (4) hours work.

7.5    Work performed by employees on any of the following days, or between the hours specified below, shall be considered as premium work and paid for according to the premium rates of pay set forth herein:

        Sundays:    Employees who work six (6) hours or more on Sunday will be paid a minimum of eight (8) hours of work at the straight time hourly rate of pay.

        Holidays:    As defined in Section 10.5 below: One and one-half (1-1/2) times the employee's regular rate of pay.

7.6    This Article shall in no way restrict the Employer in his assignment of work shifts or days off of any employee.

7.7    Employees who express the desire in writing to work four (4) ten (10) hour days may be allowed to do so at the Employer's option, and shall be compensated for all such hours at the straight-time hourly rate. All other terms and conditions of the contract shall apply as if the employee worked forty (40) hours in five (5) eight (8) hour days.

7.8    No Pyramiding. For the purpose of computing hours worked over forty (40) in a workweek, hours which are compensated for but not worked during the employee's workweek shall not be considered as hours worked. Overtime premium payments shall not be duplicated or pyramided for the same hours worked or paid for under any of the terms of this Agreement, and to the extent hours are compensated for at overtime or premium rates under one provision of this Agreement, they shall not again be counted as hours worked or deferred overtime under the same or any other provision of this Agreement.

7.9    Compensation Claims. Any claims for wages, overtime or other complaint regarding employee compensation must be presented in writing to the Employer within fourteen (14) calendar days of the day the employee is paid for the period in which he/she claims a

discrepancy, or within fourteen (14) calendar days of the day the employee has knowledge or should have knowledge of the discrepancy; otherwise, the Union, the Employer and the employee agree that payment is made in full and the right to protest is waived.

7.10    No Guarantee. Notwithstanding any other provision of this Agreement to the contrary, nothing herein shall be deemed a guarantee of any number of hours of work per day or any number of days of work per week.

## ARTICLE 8 - SENIORITY - TRANSFER

8.1    Seniority - Classifications. Seniority shall be based upon continuous service with the Employer. Seniority shall be applied on an individual store basis by classification in each department covered by Schedule "A." Seniority as defined above shall apply in the reduction of the number of employees in a store performing comparable work. The last employee hired shall be the first employee laid-off provided skills, qualifications, availability, work performance, and ability are reasonably equal as determined in good faith by the Employer. Seniority as defined herein shall be applicable when the employee completes his/her probationary period as set forth in Article 6, and shall date from the most recent date of hire.

8.2    Promotions. In promotion, senior employees shall be given consideration where merit, skills and ability to perform the new job efficiently are approximately equal as determined in good faith by the Employer, but no trial period shall be required. Employees demoted from a higher classification to a lower classification shall not lose seniority.

8.3    Layoff and Recall. In the reduction of the number of employees due to lack of work, the last employee hired shall be the first to be laid off; and in rehiring, the last employee laid off shall be the first rehired until the list of employees previously laid off has been exhausted. However, an employee's recall rights expire one-hundred eighty (180) calendar days from the date of layoff. Employees who are laid off due to lack of work shall have seniority rights in rehiring for extra and/or steady jobs subsequently available with the Employer prior to the hiring of new employees.

8.4    Seniority shall be forfeited and the employment relationship severed when an employee:

      a.  Quits, is discharged, or is terminated for just cause;

      b.  Fails to provide the Employer with current contact information while the employee is on layoff status;

      c.  Is laid off more than one hundred eighty (180) calendar days;

      d.  Fails to report back to work from layoff within five (5) calendar days after being notified by letter from the Employer mailed to the employee's last address on the Employer's records;

      e.  Declines an Employer offer to return to work while on layoff; or

10

     f.   Has exhausted Oregon Family Medical Leave Act (OFLA) time off and is still unable to return to work.

## ARTICLE 9 - WAGES

9.1    Wage rates for specified job classifications shall not be less than as set forth in Schedule "A," attached hereto as a part of this Agreement, and shall be maintained for the life of this Agreement.

Recognition of Experience. In the application of the wage provisions, a newly hired employee's prior working experience in the same industry within the prior five (5) years shall be considered as follows:

New Hires. Shall receive as follows for provable, comparable experience:

If less than one (1) year has elapsed since last employed: Fifty percent (50%) credit for prior experience.

If less than two (2) years have elapsed since last employed: Twenty-five percent (25%) credit for prior experience.

If more than two (2) years have elapsed since last employed: No credit.

9.2    When a job classification is established by the Employer for which no rate of pay is provided in said Schedule "A," the Employer agrees to meet with the Union upon its request for the purpose of negotiations for a wage rate for such classification. The wage rate agreed upon as the result of such negotiations shall be effective from the date of the establishment of the new job classification. The establishment of such new wage rates shall not be subject to any of the provisions of Article 17 below.

## ARTICLE 10 - PAID TIME OFF

10.1    Purpose. The Employer's Paid Time Off (PTO) is provided to encourage planning and predictability of employee time off. PTO compensates employees at their base wage when they are absent from work for such purposes as vacation, illness, holidays, religious observances, preventative health and dental care, and other excused absences.

10.2    Eligibility. All employees in the bargaining unit are covered by the plan except employees hired only for casual work or seasonal work of a temporary nature.

10.3    Yearly PTO Accrual.

| | | |
|---|---|---|
| a. | 1st year | 15 calendar days (.05769 PTO hours for each straight time hour paid) |
| b. | 2nd through 6th years | 20 calendar days (.07692 PTO hours |

11

for each straight time hour paid)

c.   7th and all subsequent years    25 calendar days (.09615 PTO hours
for each straight time hour paid)

All PTO accrual will be earned and paid on a Proportionate Basis, based on compensable hours worked from anniversary hire date to anniversary hire date.

10.4  (a)  Use of PTO. PTO may be used after completion of the year in which it is earned. PTO may not be used in advance with an agreement to reimburse the Employer and may not be used on regularly scheduled days off.

(b)  PTO, as with all other time off, must, except in unusualcircumstances, be requested in writing in advance of the time off desired, and approved in writing by the Supervisor. Approval will be based upon the Employer's determination of its staffing needs. When time off is requested without prior approval due to an emergency or illness, a specific reason for the request is to be given and accrued PTO must be used. The employee requiring time off without prior approval must call in as soon as possible and, at a minimum, two (2) hours prior to the employee's shift to notify the Employer at a phone number designated by the Employer. If the employee does not have approval for each day of absence, it shall be considered as an unpaid, unexcused absence. Such absences may be the basis for disciplinary action. The Employer may request a doctor's certificate of illness if the amount of time off due to illness is deemed excessive by the Employer.

(c)  Employees are encouraged to use at least (eighty) 80 hours of PTO per year. It is also recommended that employees reserve PTO to cover emergencies.

(d)  If there are two (2) or more requests for time off by employees and if not all of such requests can be accommodated, then an employee requesting PTO shall be given priority over an employee requesting time off without pay regardless of seniority.

(e)  PTO may not be used to claim pay for time lost due to tardiness. This lost time cannot be regained, shall be considered unexcused, and may be the basis for disciplinary action.

(f)  The first two (2) weeks of earned PTO may be taken consecutively by the employee if so desired. Additional PTO may be taken in a manner mutually acceptable to the Employer and the employee.

(g)  Accrued PTO pay appropriate for the length of the scheduled vacation shall be paid to the employee prior to the start of the vacation, providing the employee requests the pay in writing through his/her supervisor seven (7) calendar days prior to his/her vacation.

(h)  Any employee discharged for dishonesty shall forfeit accumulated PTO pay.

12

10.5   Holidays. Employees may choose not to receive PTO for any holiday recognized under this Agreement by submitting a written request no less than seven (7) calendar days ahead of the holiday, specifically requesting that PTO not be paid for that holiday.  In the event an Employee does not submit a written request to waive the payment of PTO for the holiday, the Employee will receive PTO for that holiday.

10.6   PTO Cashout. An employee shall cash out all accrued PTO hours in excess of two hundred forty (240) hours on the first payday in June or December by thirty (30) calendar days' advance written notice to Employer. It is further agreed that any employee who has accrued at least one hundred twenty (120) hours PTO may cashout up to forty (40) hours with the notice described above, so long as the employee has taken at least forty (40) hours of paid time off in the prior six months for a June cash out and at least eighty (80) hours of paid time off in the prior twelve (12) months for a December cash out.

## ARTICLE 11 - GENERAL CONDITIONS

11.1   Any expense for aprons, special uniforms, or headwear or purchase of same shall be borne by the Employer. Each employee shall be furnished sufficient uniforms if required by the Employer.

11.2   All bonuses, discounts, and commission paid or given to the employee shall not be considered as wages under the terms of this Agreement, but are to be considered above the minimum wages provided for in this Agreement. Bonuses, discounts, and commissions shall not be used to defeat the wage provisions of the Agreement, and shall be issued in the sole discretion of the Employer. The Employer may pay wages and/or benefits in excess of the contract minimums on a bargaining unit-wide and/or only to specified classifications and/or only to specified individuals. The Employer may reduce the wage rates of employees receiving pay rates in excess of the minimum rates contained in Schedule "A" provided such reductions will not be less than the wage rates required by Schedule "A." Such payment in excess of the minimum rates of pay or a reduction of such excess pay to the minimums described in Schedule "A," shall not be deemed a violation of any provision of this Agreement and/or the National Labor Relations Act, as amended.

11.3   The Employer shall establish regular pay days, and furnish to each employee on such pay days, a wage statement showing the period of time covered, name of the employee, straight-time and overtime hours worked, total amount of wages paid, and itemized deductions made therefrom. Payroll checks will be made available within three (3) weekdays of the end of the pay period.  The use of electronic deposit is encouraged for payroll checks.  A similar statement will be given to the employee upon termination of employment.

11.4   The Employer shall make suitable provision for recording the hours worked by each employee covered by this Agreement either through the use of time clocks or such other method as may be required by law.

When requested to do so, the Employer shall make such records available to an authorized representative of the Union for examination.

13

11.5  All hours of work shall be consecutive except for meal periods which shall be one (1) hour Monday through Saturday. No employee shall work a shift of six (6) hours or more without a meal period. Any employee wanting to take one-half (1/2) hour lunches will need management approval.

Employees shall be entitled to a mid-shift rest period of no more than ten (10) minutes for every four (4) hour segment of work or major part thereof (i.e., two (2) hours and one (1) minute through four (4) hours).

## ARTICLE 12 - JURY DUTY

12.1 After their first year of employment, employees who are regularly employed twenty (20) hours or more per week who are called for service on a court jury, shall be excused from work for the calendar days on which they serve and shall be paid the difference between the fee they receive for such service and the amount of straight-time earnings lost by reason of such service up to a limit of eight (8) hours per day and forty (40) hours per week; with a total limit of ten (10) calendar days in any rolling three (3) calendar year period; provided, however, an employee called for jury duty who is temporarily excused from attendance at court must report for work if sufficient time remains after such excuse to permit him/her to report to his/her place of work and work at least one-half (1/2) of his/her normal workday. Nothing in this Article shall have the intent of limiting the amount of time an employee may serve.

## ARTICLE 13 - HEALTH & WELFARE

There shall be no increase in the Employer's contributions toward Health & Welfare trust plans during the term of this Agreement.  The employee shall pay all amounts in excess of the hourly composite amount as established by the trustees, per hour, by way of a payroll deduction.

13.1  (a)  Health and Welfare and Dental Contributions. Effective for hours worked beginning May 1, 2016, the Employer shall contribute an hourly composite amount as established by the trustees (currently five dollars and forty-two cents ($5.42) for each straight-time compensable hour paid employees pursuant to this Agreement to a maximum of forty (40) hours per week and one hundred seventy-three (173) hours per month, to the persons and at the time and place designated by the Trustees of the UFCW Local 555 Employers Health Trust. This hourly Employer contribution rate shall remain unchanged during the term of this Agreement. If the hourly rate is increased by the Trust during the term of this Agreement, the employee shall pay all amounts in excess of five dollars and forty-two cents ($5.42) per hour by way of a payroll deduction each pay period. The purpose of the contributions is to provide health, dental, vision and prescription drug benefits to employees who have worked eighty (80) or more hours per month. No contributions shall be due or payable on any probationary employee. For purposes of this Article, compensable hours shall include all straight-time hours worked and all PTO taken.

14

(b)     The Employer agrees to accept and be bound by any and all changes, modifications and amendments to the Trust which are the result of action taken by the Board of Trustees of the UFCW Local 555 — Employers Health Trust. Should the benefit eligibility provisions or rules or any of the benefits provided under the Trust Agreement be modified during the term of this Agreement, any such modifications, regardless of the nature of such modifications, shall be applicable under the terms of this Agreement on the same dates and in the same amounts as those specified in the Trust Agreement provided that employees hired prior to April 1, 2010 will receive the highest level of benefit coverage provided by the Trust and subject to the thirty (30) calendar day notice provisions of Section 15.1.

(c)     Managerial employees outside the bargaining unit who are employed on or after May 1, 2016 or who have worked as an employee within the bargaining unit for a minimum of thirty-six (36) months shall be eligible for the health, welfare, and dental benefits described in Section 13.1(a) under the same terms as members of the bargaining unit. Managerial employees will not be covered under any other terms of the parties' labor agreement.

(d)     At any time that the amount is not paid in full by the Employer the shortfall will be paid by the individual employee by way of a pre-tax withholding, split between the two (2) paydays per month.

(e)     The Employer understands that the level of benefits may be adjusted each year.

(f)     The contributions required by this Article are due and payable the first (1st) day of the month, however, if payment is not made by the twentieth (20th) of the month, it shall be considered a violation of this Agreement.

13.2    Retiree Health and Welfare — Eligibility Requirements. Health and welfare benefits will be provided for all United Food and Commercial Workers Union, Local 555 members and their dependents drawing retirement benefits (present and future) from the Oregon Retail Employees Pension Trust, in accordance with the provisions below. The Trustees of the UFCW Local 555 - Employers Health Trust will establish and administer the Retiree Health Plan.

Retiree Health insurance coverage shall be provided for persons who meet all of the following requirements:

(a)     Be a retiree who is currently receiving the Oregon Retail Employees Pension Trust pension benefit for regular age sixty-five (65) requirement (regular or spouse option), or disability retirement, based on the Oregon Retail Employees Pension Plan in effect as of October 1, 1987; and

(b)     Have been covered as an employee under the plan for hospital, medical, surgical and prescription drug benefits for sixty (60) months of the eighty-four (84) months immediately preceding the date of retirement.

An employee opting for retirement before age sixty-five (65) must be at least sixty-two (62) years of age and have completed fifteen (15) years or more of service for retirement

15

purposes with the Oregon Retail Employees Pension Trust and had contributions made on their behalf for sixty (60) out of the last eighty-four (84) months and make self-payments at the current premium rate until age sixty-five (65).

13.3    Funding. The amount allocated for Retiree Health and Welfare will not exceed five cents ($0.05) per hour from the total Employer Health and Welfare contribution. Such contribution, in the amount stated herein, shall be used to maintain the level of benefits provided retirees.

In the event the cost of retiree health and welfare benefits exceeds the amount specified per hour during the life of this Agreement, the Parties instruct and direct the Trustees of the Health and Welfare Trust to adjust benefits to retirees to bring the cost of the benefits within the limitations of the five cents ($0.05) requirement provided above.

13.4    Employer Obligation — Funding Only. The Employer's obligation to pay contributions to help fund retiree health benefits for eligible retirees is limited to the commitment to pay the hourly rate based upon hours worked by current employees for the duration of this Agreement. While the Employer has agreed to monthly payments which may purchase retiree benefits, the Employer has not agreed to fund or guarantee benefits which are either vested or unvested for employees now retired or present employees who subsequently retire.

## ARTICLE 14 - PENSION

14.1    The Employer shall contribute sixty-two cents ($0.62) per each straight-time compensable hour which includes straight-time hours worked and PTO hours taken only (up to a maximum of one hundred seventy-three (173) hours) paid employees pursuant to this Agreement into the Oregon Retail Employees Pension Plan, or its successor. It is further understood and agreed that the above referenced Trust Fund shall, at all times, qualify for approval by the Bureau of Internal Revenue of the U.S. Treasury Department so as to allow the Employer an income tax deduction for the contributions paid hereunder.

14.2    Of the sixty-two cent ($0.62) pension contribution referred to in Section 14.1 above, twelve cents ($0.12) per hour of the hourly contribution rate shall be contributed to improve Trust funding and shall be outside the benefit formula. At such time that the Trust Actuary determines the fund is sufficiently overfunded, this twelve cent ($0.12) contribution increase will be incorporated inside the benefit formula.

14.3    (a)    Should the Plan trustees determine that additional funding is needed to improve Trust resources, the Employer agrees that it will pay up to an additional eight cents ($0.08) or a total of seventy cents ($0.70) per straight-time compensable hour beginning with hours worked or PTO taken on or after June 1, 2010. This additional contribution shall be considered outside the benefit formula. At such time the Plan Actuary determines the fund is sufficiently overfunded, this eight cent ($0.08) contribution shall be incorporated into the benefit formula.

(b)    Should the Plan trustees determine that additional funding is needed to improve Trust resources, the Employer agrees that it will pay an additional eight cents ($0.08) or a total of seventy-eight ($0.78) cents per straight-time compensable

hour beginning with hours worked or PTO taken on or after June 1, 2011. This additional contribution shall be considered outside the benefit formula. At such time the Plan Actuary determines the fund is sufficiently overfunded, this eight cent ($0.08) contribution shall be incorporated into the benefit formula.

(c)     Should the Plan trustees determine that additional funding is needed to improve Trust resources, the Employer agrees that it will pay an additional seven cents ($0.07) or a total of eighty-five cents ($0.85) per straight-time compensable hour beginning with hours worked or PTO taken on or after June 1, 2012. This additional contribution shall be considered outside the benefit formula. At such time the Plan Actuary determines the fund is sufficiently overfunded, this seven cent ($0.07) contribution shall be incorporated into the benefit formula.

(d)     Any contribution described in Section 14.3 not used or "called" by April 30, 2016, will not be available for "call" after this date unless agreed to in writing between the Employer and Union.

14.4    The contributions required by this Article are due and payable the first (1st) day of the month, however if payment is not made by the twentieth (20th) of the month, it shall be considered a violation of this Agreement.

## ARTICLE 15 - ACCEPTANCE OF TRUSTS

15.1    The Employer and the Union accept and agree to be bound by the terms of the existing Pension and Health and Welfare Trust Agreements established under the terms of this Agreement. By this acceptance, the Employer agrees to and shall become a party to each of said Trusts with the same force and effect as though the Employer had executed the original declarations. Further, the Employer accepts as his representatives for the purposes of these Trust Funds, the Employer Trustees serving on the Board of Trustees of said Trust Funds, and their duly appointed successors. Any amendments that from time to time may be made to the aforesaid Trusts shall be binding upon the Employer, provided such written amendments are first sent to the Employer's President no less than thirty (30) calendar days before the effective date of such amendment.

15.2    Damages for Non-Payment. Insofar as payments by the Individual Employer into Trust Funds provided in this Article of this Agreement, time is of the essence. The Parties recognize and acknowledge that the regular and prompt payment of amounts due by the Individual Employers to these Funds is essential to the operation of the Trusts and the provisions of benefits and that it would be extremely difficult, if not impracticable, to fix the actual expense and damage to these Funds and to the covered employees which will result from the failure of an individual Employer to make such monthly payments in full within the time provided. Therefore,

(a)     Any Employer who willfully fails to make contributions to the Trust Funds in accordance with the requirements of this Article may be deemed by the Trustees to be in default. The phrase "willfully fails to make contributions" means an intentional failure to contribute with the knowledge that such contributions are due. If the failure to contribute by the Employer is found by the Trustees to have been

caused by a miscalculation or by lack of knowledge that such contributions are due, the Employer will not be in default. The Trustees may, after written notice to an Employer, declare him to be in default.

(b)     In the event that an Employer is held by the Trustees to be in default, the Trustees may, at their discretion, without notice to said Employer, bring suit pursuant to this Article to recover the amounts due. An Employer in default shall pay all attorney's fees, court costs, disbursements and any other expenses necessarily incurred by the Trustees in recovering overdue contributions (whether or not court action is actually commenced) together with interest on the overdue contributions accruing from the date of default at the rate of ten percent (10%) per annum. Venue for actions by the Trustees against defaulting Employers shall be in Multnomah County, Oregon.

## ARTICLE 16 - NON-DISCRIMINATION

16.1    The Employer and the Union agree that each will fully comply with the applicable laws and regulations regarding discrimination and will not discriminate against any employee because of such person's race, religion, color, national origin, sex, or age.

## ARTICLE 17 - GRIEVANCE PROCEDURE

17.1    Definition. For the purpose of this Agreement, the term "grievance" means any dispute between the Employer and the Union concerning the interpretation or application of a specific provision of this Agreement, or discipline consisting of a written warning, suspension, or termination (in which the standard will be just cause). Grievances shall be handled in the following manner:

Step 1.    An attempt should always be made to resolve complaints at the Supervisory level in an informal/oral manner prior to the filing of a formal written grievance. In cases involving a complaint by an employee or employees, the employee(s) with a shop steward shall present such grievance orally to the supervisor of the department involved within seven (7) calendar days after the event(s) giving rise to the complaint occurred. Employer shall respond to such oral grievance within five (5) calendar days of its receipt. If the Employer's response does not resolve the grievance, the grievance shall be reduced to writing and processed pursuant to Step 2 below.

Step 2.    Any grievance shall be presented, in writing, by the aggrieved party to the other party within twenty (20) calendar days from the date of the occurrence first giving rise to such grievance or dispute [which includes all time involved in Step 1 above], except that in cases of discharge the grievance must be presented within ten (10) calendar days of the date of discharge. Discharge grievances may commence at Step 2. The grievance shall specify in detail the alleged contract violations, including the contract provisions alleged to have been violated. In the event that any grievance is not filed in accordance with the requirements of this paragraph,

the grievance shall be considered null and void. The Employer will respond to the written grievance within seven (7) calendar days.

Step 3.   If the grievance, having been carried through Steps 1 and 2, has not been satisfactorily resolved, the matter shall be presented within seven (7) calendar days of the Employer's response in Step 2 to the Employer's President, or the designated Union representative, in a final effort to resolve the issue. Such meeting shall take place no later than fourteen (14) calendar days after a request for such meeting has been made.

Step 4.   If no agreement is reached at Step 3, the moving party shall request, within fourteen (14) calendar days of the Step 3 meeting described above, that the FMCS furnish a list of eleven (11) arbitrators, who currently reside in the Pacific Northwest or who have previously resided for no less than ten (10) years in the Pacific Northwest during the period of 1985 through the date of the grievance, to the parties. The parties will select an arbitrator, within seven (7) calendar days of receipt of the list, by alternatively deleting one name at a time until a single name remains. The moving party shall delete the first name. A copy of the request for arbitration shall be mailed to the other party.

17.2   Time Limits. Any time limits provided in this grievance procedure are stated in calendar days and may be waived by mutual agreement in writing by the Parties. A failure by the Employer to respond within the time limits provided or agreed upon shall be deemed a rejection of the grievance, and the grievance may be filed in the next step within the time provided from the date of rejection. A grievance may be terminated at any time upon receipt of a signed statement from the Union that the matter has been resolved; and a failure to submit or pursue the grievance in accordance with this procedure or within the time limits prescribed or agreed upon shall constitute an abandonment of a grievance.

17.3.   Arbitration. The arbitrator shall act only on the contractual obligations inherent in this Agreement. He shall not have the right to change, modify or add to the provisions of this Agreement in any way nor to require of either party any act not required by this Agreement. However, in cases in which terminated or laid off employees are ordered reinstated, and in whatever measure he considers justified by the circumstances, the arbitrator may direct that the employee recover earnings lost because of the layoff or termination. Grievances by probationary employees are not subject to the arbitration provisions of this Agreement. The arbitrator shall render the decision and award within thirty (30) calendar days of the close of the hearing or the receipt of briefs, whichever is later; any arbitrator failing to comply with these provisions shall not be compensated except for actual costs incurred. The moving party shall notify the arbitrator of this provision during the selection process.

a.   The arbitrator's decision shall be final and binding on all parties to the complaint or grievance as shall any agreement or settlement reached in accordance with Steps 1, 2 and 3 of the procedures outlined above.

b.   The fees and expenses of the arbitrator shall be borne by the losing party as determined by the arbitrator. If in the judgment of the arbitrator, equity is best served by appointing the cost of the arbitration between the Parties, he/she may

19

order such appointment. All other expenses shall be borne by the party incurring or requesting them, including stenographers and attorney's fees. Any party that withdraws a case from arbitration within ten (10) calendar days of the date of the hearing will be responsible for all the costs associated with the arbitrator's cancellation fees and expenses.

c.    Any back pay remedy ordered by an arbitrator shall be reduced by the amount of any gross interim earnings such employee received from other employment and/or earnings from unemployment compensation payments during the period the employee was off work prior to the arbitrator's back pay decision.

d.    The provisions of this Article shall not be interpreted to require that the Union process any grievance through the grievance or arbitration procedure which it believes in good faith, lacks sufficient merit.

e.    Neither the Union nor the Employer are obligated to arbitrate any grievance arising after the expiration date of this Agreement unless otherwise mutually agreed to in writing.

## ARTICLE 18 - SEPARABILITY

18.1    Should any portion of this Agreement be adjudged by the Supreme Court or other court of appropriate jurisdiction, to be in violation of any state or federal law, then such portion or portions shall become null and void and the balance of this Agreement remain in effect. Both Parties agree to immediately renegotiate any part of this Agreement found to be in such violation by the court and to bring it into conformance therewith as soon as possible after notification.

18.2    In the event of any change to federal, state or local law, including the passage of new legislation, during the term of this Agreement that creates additional economic cost(s) to the Employer as a result of adding new benefits, increasing existing benefits or increasing employees wage rates or any other economic term of the parties labor agreement in excess of the Employer's costs at the time of ratification of this Agreement, the Employer shall have the right upon no less than fifteen (15) calendar days' written notice to reopen the economic terms of this Agreement (Article 7 - Hours of Work, Article 9 and Schedule A — Wages, Article 10 — Paid Time Off, Article 13 Health & Welfare, Article 14 — Pension). The purpose of such reopener is to permit the parties to renegotiate the economic provisions of this Agreement so that the Employer's labor costs do not exceed the Employer's costs in existence at the time the parties' agreement was ratified. During this period of renegotiation, the no strike provisions of Article 19 shall remain in full force and effect. If the parties have not reached agreement on changing the economic terms of the Agreement within forty-five (45) calendar days of the start of negotiations which addresses the additional cost of complying with any federal, state or local law, the Employer shall have the right to implement its last, best and final offer.

20

## ARTICLE 19 - NO STRIKE CLAUSE

19.1    The Employer agrees that during the term of this Agreement it shall not cause nor permit any lockout of employees from their work.

19.2    Neither the Union (its officers, agents, representatives, stewards, and members) nor the employees shall in any way, directly or indirectly, instigate, lead, engage in, authorize, cause, assist, encourage, participate in, ratify, or condone any strike, sympathy strike, slowdown, work stoppage, or any other interference with or interruption of work at any of the Employer's operations.

19.3.    Any such conduct shall be deemed a violation of this Agreement, and any individual employee or group of employees engaged in such conduct shall be subject to immediate discipline, including dismissal. Any employee(s) disciplined for violation of this provision may grieve the discipline under the grievance and arbitration provision of the Agreement.

## ARTICLE 20 - SUBPOENAS

20.1    An employee who is subpoenaed by the Employer to testify in a legal proceeding on behalf of the Employer will be compensated at the employee's regular straight-time hourly rate of pay for the actual time spent in official trial proceedings. Such compensation shall not include any differentials of any nature. The employee's compensation shall only occur during the employee's regularly scheduled workday.

20.2    Any employee who is subpoenaed to appear as a witness in a legal proceeding by a party other than the Employer, shall be granted leave without pay.

## ARTICLE 21 - WORK RULES

21.1    The Parties recognize that the Employer is directly responsible for carrying out the functions and services to its customers. For this reason, it is jointly recognized that the Employer retains broad authority to fulfill its responsibilities and may do so by implementing work rules, oral or written, which now exist or which may be implemented in the future. It is agreed, however, that no work rule will be adopted or implemented which is inconsistent with a specific provision of this Agreement. All new work rules which shall be implemented will be reduced to writing and furnished to employees prior to their effective date. The Employer agrees the Union has the right to challenge work rules in the grievance procedure if it believes the work rule to be arbitrary and/or capricious.

## ARTICLE 22 - PAST CUSTOM OR PRACTICE

22.1    It is mutually agreed and understood by the Parties that the Employer will not be required to continue past practices and/or practices which were in effect prior to the signing of this Agreement. All employee rights and benefits shall be limited to the express provisions of this Agreement.

## ARTICLE 23 - PERFORMANCE OF UNIT WORK

23.1    Supervisors and other Employer employees may perform work that is otherwise performed by the employees covered by this Agreement in cases of emergency, instruction, start up, testing of new equipment, where there is an insufficient number of employees covered by this Agreement available to perform the needed tasks in an efficient manner or to avoid overtime, and, generally, where, in the opinion of the Employer, the needs of the Employer's customers will be best served.

## ARTICLE 24 - EXPIRATION AND RENEWAL

24.1    THIS AGREEMENT shall be in full force and effect from and after May 1, 2019 until April 30, 2024, at which time it shall automatically renew itself for a period of one (1) year from said date, and thereafter for each year upon said anniversary date, without further notice; and on each of said dates, upon written notice being served upon either party by the other at least sixty (60) calendar days prior to said date, either party may open this Agreement for the purpose of discussing revisions.

FARR'S HARDWARE

_____    5|28|19
Jay Farr                                  Date
Owner

UNITED FOOD & COMMERCIAL
WORKERS UNION LOCAL 555

_____    5/13/19
Dan Clay                                  Date
President

22

## SCHEDULE "A"

Section 1: The following minimum hourly rates of pay shall be paid on the effective dates as shown below.

|  | Effective 5/1/2019 | Effective 5/1/2020 | Effective 5/1/2021 | Effective 5/1/2022 | Effective 5/1/2023 |
|---|---|---|---|---|---|
| **Hardware Clerks/Service Tech** | | | | | |
| 0-1040 hours | $11.05 | $11.60 | $12.25 | $13.05 | $13.95 |
| 1041-2080 hours | $11.26 | $11.81 | $12.46 | $13.26 | $14.16 |
| 2081-3120 hours | $11.40 | $11.95 | $12.60 | $13.40 | $14.30 |
| 3121-4160 hours | $11.94 | $12.49 | $13.14 | $13.94 | $14.84 |
| Thereafter | $15.47 | $16.02 | $16.67 | $17.47 | $18.37 |
| | | | | | |
| **Checker** | | | | | |
| 0-1040 hours | $11.05 | $11.60 | $12.25 | $13.05 | $13.95 |
| 1041-2080 hours | $11.05 | $11.60 | $12.25 | $13.05 | $13.95 |
| 2081-3120 hours | $11.06 | $11.61 | $12.26 | $13.06 | $13.96 |
| 3121-4160 hours | $11.84 | $12.39 | $13.04 | $13.84 | $14.74 |
| Thereafter | $14.22 | $14.77 | $15.42 | $16.22 | $17.12 |
| | $0.50 | $0.55 | $0.65 | $0.80 | $0.90 |

## LONGEVITY

All employees with ten (10) years or more of seniority, shall receive a three percent (3%) premium added to the Employee's straight time hourly rate of pay.

The duties of a checker shall be to perform such duties that are involved in the operation of the check stand, including clean-up, price changes, and other similar duties in the check stand area.

Any checker found to be performing hardware clerk's work, shall be placed on the appropriate rate of pay in the hardware clerk's pay schedule.

Effective May 1, 2007 no employee shall be paid less than a minimum of thirty cents ($0.30) per hour above the then current Oregon minimum wage.

Greeters. Current minimum wage.

23

The Employer shall be permitted to employ not more than one greeter per day. The greeter shall have all rights under this Agreement except shall be exempt from Health & Welfare and Pension provisions of this Agreement. The greeter shall not perform bargaining unit work.

# LETTER OF UNDERSTANDING

# BETWEEN

# FARR'S HARDWARE

# AND

# UFCW LOCAL 555

## OPTION TO WORK FULL TIME

This Side Letter of Understanding is entered into between Farr's Hardware (hereinafter referred to as the "Employer") and United Food and Commercial Workers Union, Local 555 (hereinafter referred to as the "Union"), for the purpose of confirming the parties' agreement that all bargaining unit employees hired prior to 4/30/92 shall have the option to work full time (40 hours per week) before the Employer will hire any additional bargaining unit employees. The only such employee is: Dana Wood. If this employee leaves the employment of the Employer for any reason, such employee will be removed from this provision, even if such employee is subsequently rehired.

This Side Letter of Understanding shall be incorporated into and considered a part of the parties' existing Labor Agreement. Any provisions not referenced by the above Side Letter of Understanding shall remain unchanged and in full force and effect for the remaining term of the parties' Labor Agreement.

FARR'S HARDWARE

UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 555

_____  5/23/19
Jay Farr                    Date

_____  5/13/19
Dan Clay                    Date

Owner

President

25

# LETTER OF UNDERSTANDING

## BETWEEN

## FARR'S HARDWARE

## AND

## UFCW LOCAL 555

## USE OF TEMPORARY EMPLOYEES

This Side Letter of Understanding is entered into between Farr's Hardware (hereinafter referred to as the "Employer") and United Food and Commercial Workers Union, Local 555 (hereinafter referred to as the "Union"), for the purpose of confirming the parties' agreement that the Employer shall have the right to supplement its regular workforce with temporary seasonal employees.

Temporary employees are defined as those employees hired by the Employer to supplement its regular workforce during vacation periods; periods of peak work, including, but not limited to, summer time or holidays; to replace injured or ill employees or employees on an authorized leave of absence; and when the Employer requires extra help to perform temporary assignments.

Temporary employees shall not accrue any seniority rights nor shall they be covered by the terms of the parties' Collective Bargaining Agreement. No temporary employee will be used wherever regular employees would be laid off as a direct result of Employer's use of temporary employee(s).

The same individual temporary employee may not work more than ninety (90) days in any regular six (6) month period.

This Side Letter of Understanding shall be incorporated into and considered a part of the parties' existing Labor Agreement. Any provisions not referenced by the above Side Letter of Understanding shall remain unchanged and in full force and effect for the remaining term of the parties' Labor Agreement.

FARR'S HARDWARE

Jay Farr _____    5/23/19  Date

Owner

UNITED FOOD & COMMERCIAL
WORKERS UNION LOCAL 555

Dan Clay _____    5/13/19  Date

President

26

# LETTER OF UNDERSTANDING

## BETWEEN

## FARR'S HARDWARE

## AND

## UFCW LOCAL 555

## HOLIDAY HOURS

This Side Letter of Agreement is entered into between Farr's Hardware (hereinafter referred to as "Farr's") and the United Food & Commercial Workers, Local 555 (hereinafter referred to as "UFCW" or the "Union") for the purpose of confirming the parties' understanding with regard to holiday closures.

The parties acknowledge and agree that as of May 1, 2019, Farr's has no present plans to open its stores on New Year's Day, Labor Day, Thanksgiving Day or Christmas Day. However, the parties further agree that if Farr's should change its plans for any reason, and determine that either or both of its stores will be open on any of these four (4) holidays, then Farr's will provide employees with reasonable advance notice of such intended change.

Farr's will first seek to staff any of these holidays by requesting that employees who are willing to work on the holiday volunteer to work the holiday shift(s). In the event that an insufficient number of employees volunteer to work on the designated holiday, Farr's will require the least senior qualified employees to work any shift(s) not covered by volunteers.

This Side Letter of Agreement shall be deemed part of and incorporated into the terms and provisions of the parties' new Collective Bargaining Agreement ("CBA") in effect from May 1, 2019 through April 30, 2024. Any provision of the CBA not referenced by this Side Letter of Agreement shall remain unchanged and in full force and effect for the remaining term of the CBA.

FARR'S HARDWARE

UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 555

_____     5/23/19
Jay Farr                    Date

_____     5/13/19
Dan Clay                    Date

Owner

President

27